IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jerry Jones, )<br><br> Plaintiff, )<br><br> vs. )<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security, )<br><br> Defendant. ) | Civil Action No. 6:14-1328-RBH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on June 7 and 14, 2011, respectively, alleging that he became unable to work on May 7, 2008. He later amended the alleged onset date to January 1, 2010. The applications were denied initially and on reconsideration by the Social Security Administration. On October 6, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

G. Roy Sumpter, an impartial vocational expert, appeared on February 1, 2013, considered the case *de novo*, and on February 22, 2013, issued a partially favorable decision, finding the plaintiff was disabled as of August 24, 2012, based on his age and direct application of the Medical-Vocational Guidelines, but did not meet the Social Security Act's definition of disability between January 1, 2010, and August 23, 2012. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 6, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

(2)    The claimant has not engaged in substantial gainful activity since the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    Since the amended alleged onset date of disability, January 1, 2010, the claimant has the following severe impairments:    degenerative joint disease of the knees, degenerative disc disease, degenerative joint disease of the shoulders, gout, and flat feet (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

(4)    Since the amended alleged onset date of disability, January 1, 2010, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that since the amended alleged onset date of January 1, 2010, the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) except the claimant could never climb ladders, ropes, or scaffolds; the claimant could occasionally bend, stoop, crawl, crouch, kneel, and balance; the claimant should avoid concentrated exposure to workplace hazards.

2

(6)    Since the amended alleged onset date of January 1, 2010, the claimant has been unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    Prior to the established disability onset date, the claimant was a younger individual age 45-49. On August 24, 2012, the claimant's age category changed to an individual closely approaching advanced age (20 C.F.R. §§ 404.1563 and 416.963).

(8)    The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Prior to August 24, 2012, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix ).

(10)    Prior to August 24, 2012, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)    Beginning on August 24, 2012, the date the claimant's age category changed, considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(12)    The claimant was not disabled prior to August 24, 2012, but became disabled on that date and has continued to be disabled through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

4

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a  verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Medical Evidence During Relevant Period*

On December 13, 2010, eleven months after his amended alleged onset date of disability, the plaintiff presented to James Gainey, M.D., for an initial evaluation (Tr. 149-50). The plaintiff complained of left knee pain, right ankle pain, and back pain, and related that he was not on any medication for his conditions (Tr. 149). On examination, the plaintiff was pleasant and in no apparent distress. He was described as obese, had an antalgic gait and limp, and a mild deformity and effusion with tenderness in his left knee. The plaintiff was oriented to time, place, and person, and displayed normal mood and effect. He had intact coordination, sensation, gait, and station. The plaintiff was diagnosed with degenerative disc disease and knee pain, prescribed medication, and advised to return in three months (Tr. 149, 150).

The plaintiff returned to Dr. Gainey on March 10, 2011 (Tr. 147). The plaintiff reported that he had self-altered/discontinued medication without first consulting Dr. Gainey. Despite his medication adjustments, the plaintiff's examination remained essentially unchanged from his prior visit. The plaintiff was advised to return for follow-up in three to six months, but the record does not appear to contain any further treatment from this medical source (Tr. 147-48).

A July 25, 2011, x-ray of the plaintiff's left knee showed evidence of a prior anterior cruciate ligament ("ACL") reconstruction, mild to moderate osteoarthritis, a loose body in the anterior knee joint, and a small joint effusion (Tr. 155). A lumbar spine x-ray that same date showed early degenerative disc disease (Tr. 156).

The plaintiff attended a consultative disability evaluation with W. Russell Rowland, M.D., on July 25, 2011. The plaintiff related a history of an ACL repair in his left knee in 1996. He denied depression. On examination, the plaintiff displayed a moderate antalgic gait on the left, but walked without a limp when he performed a tandem, heel and

6

toe walk.  He displayed full and normal range of motion in his shoulders, elbows, wrists, thumbs, and fingers with full 5 out of 5 muscle and grip strength.  The plaintiff's hip range of motion was 90 out of 100, and he displayed slightly reduced 130 out of 150 flexion in his knee.  The plaintiff had full muscle strength in his legs and could squat at 70%.  He displayed mild crepitus in both knees, no swelling, and no joint effusion.  His spine had normal alignment with no evidence of muscle spasm or tenderness.  Dr. Rowland noted that the plaintiff had "a lot of exaggeration" and that his "symptoms far outweigh[ed] objective findings."  Dr. Rowland recommended an x-ray of the right foot, left knee, and lumbar spine (Tr. 158-62).  Left knee and lumbar spine x-rays taken that same date showed the previous ACL surgery with presumed misalignment or migration of the metallic tibial interference screw, mild to moderate osteoarthritis of the patellofemoral and medial tibiofemoral joint compartments, loose body in the anterior aspect of the lateral tibiofemoral joint compartment, small suprapatellar joint effusion, probable early degenerative disc disease from the L2-L3 through the L4-L5 levels, and loss of lordotic curvature (Tr. 155-56).

The plaintiff next presented to St. Luke's Free Medical Clinic in Spartanburg for treatment on February 7, 2012, when he reported knee pain, foot pain, and headaches.  The plaintiff could not flex his knee past 80 degrees.  An MRI was scheduled, and referral for the orthopedic issues was recommended (Tr. 176).  At his next appointment on March 15, 2012, it was noted that an MRI showed tendinopathy and arthropathy of the left knee.  On exam, there was painful range of motion and effusion.  The overall diagnosis was osteoarthritis of the left knee (Tr. 175).  The plaintiff was continued on conservative medication at this and his next appointment on May 29, 2012.  At the May 29th appointment, the plaintiff complained of pain in his back, legs, left knee, feet and headaches.  He was advised to see an orthopedist (Tr. 173, 175).  An appointment on July 3, 2012, addressed hypertension and reported chest pain, but records do not reflect significant findings related to the plaintiff's foot, back, shoulder, or knee (Tr. 171).

7

On July 23, 2012, the plaintiff initiated treatment with Anthony Sanchez, M.D., at Orthopedic Specialties of Spartanburg (Tr. 202). The plaintiff related knee pain and swelling, and that he took ibuprofen with no significant relief. Anxiety and depression were noted in the review of systems, but the plaintiff's mental status examination was normal (Tr. 202, 204). Dr. Sanchez noted that the plaintiff used his walker as needed and had a history of cortisone injections to his left knee. The plaintiff had mild swelling in his left knee, with no erythema or ecchymosis, and minimal tenderness. He could flex his knee to 95 degrees without instability (Tr. 204).

On July 31, 2012, the plaintiff visited the Foothills Family Medical Clinic in Boiling Springs to establish treatment for his blood pressure and cholesterol. Aside from blood pressure, foot pain, and knee complaints, the plaintiff did not relate any reports of shoulder or mental symptoms (Tr. 240).

On August 17, 2012, the plaintiff saw Rifat Hassan, M.D., with Spartanburg Internal Medicine (Tr. 258). Although the plaintiff reported depression, he denied difficulty with concentration (Tr. 260). The plaintiff had normal reflexes, coordination, and muscle strength and tone on examination, though he walked with a cane and wore a knee brace (Tr. 261).

### *Medical Evidence After Relevant Period*

On September 5, 2012, during a follow-up appointment, Dr. Sanchez noted that some relief was obtained from the use of an unloader brace, but that the plaintiff ultimately may benefit only from a total knee replacement (Tr. 199-201).

On September 7, 2012, the plaintiff saw Mark Visk, M.D., at Orthopedic Specialties of Spartanburg for recurrent foot pain. He had painful range of motion, crepitus, and used a cane. Dr. Visk diagnosed the plaintiff with fibromatosis and plantar fasciitis and instructed him to obtain custom orthotics (Tr. 195-98).

8

The plaintiff followed-up with Dr. Hassan on September 10, 2012, with complaints of a history of lower back pain radiating to his right lower extremities, which resulted in an additional diagnosis of lower back pain with radiculopathy (Tr. 252-57).

On October 3, 2012, the plaintiff presented to the Mary Black Hospital emergency room with swelling to the left foot and knee since the prior day.  X-rays taken at the time showed degenerative changes in the medial, lateral, and patellofemoral compartments with osteophyte formation.  Further calcifications of the menisci were also noted (Tr. 179-81).

On October 17, 2012, the plaintiff was seen again at Orthopedic Specialties, by Marco Rodriguez, M.D., with complaints of bilateral leg pain, neck pain, and bilateral arm pain.  His neck pain was noted to radiate bilaterally into his shoulders, and he had tingling in the tips of his fingers and toes. Dr. Rodriguez diagnosed the plaintiff with spondylosis of the lumbar and cervical spine, and a referral was made to  Matthew Terzella, M.D. (Tr. 192-94).

On November 1, 2012, Dr. Terzella examined the plaintiff for back pain issues.  The plaintiff complained of severe back pain, with the need to change positions frequently.  An exam of the lumbar spine revealed range of motion limited on flexion, extension, and lateral side bending.  Additionally, tenderness to palpation from L3-S1.  Overall diagnosis was lumbar degenerative disc disease with stenosis at L4-5, L5-S1 with radicular components on the right greater than the left (Tr. 188-91).  Dr. Terzella performed a right L5-S1 transforaminal epidural steroid injection, as well as a right S1 transforaminal steroid injection. (T. 182-83).

The plaintiff began treatment with Walter Grady, M.D., on November 5, 2012.  Dr. Grady diagnosed the plaintiff with a medial meniscus tear of the left knee and degenerative joint disease of the left knee and ordered an updated MRI of the left knee (Tr. 231-35).   The MRI of the left knee on November 7, 2012, revealed: (1) significant

9

progression of degenerative arthrosis of medial compartment with full-thickness chondral loss now evident over the medial femoral condyle and peripheral tibial plateau; (2) thin peripheral medial meniscal remnant, significantly more irregular and abnormal in signal on this exam; and (3) trace joint effusion (Tr. 229-30).

On November 14, 2012, the plaintiff saw Dr. Grady again for issues with both knees.  He rated his pain 9 out of 10.  Overall diagnoses were internal derangement of the right knee, degenerative joint disease of the left knee, and medial meniscus tear of the left knee.  The clinical notes also documented that the plaintiff was undergoing an ESI the following day for a herniated disc (Tr. 225-228).  An MRI of the right knee was performed on November 19, 2012, which showed:  (1) grade IV chondral defect (erosion of cartilage, bone on bone) along central weight-bearing aspect of medial femoral condyle and (2) degenerative chondral changes in central sulcus of the trochlea along the lateral patellar facet. (T. 223-24).

In a follow-up appointment on December 6, 2012, Dr. Grady recommended a total left knee replacement. (T. 217-20).

On December 27, 2012, Dr. Grady completed a "South Carolina Department of Social Service Physician's Statement" wherein he checked boxes to indicate that the plaintiff could not engage in any type of employment; would be unable to meet the minimum standards of employment, such as productivity, punctuality, and reliability; would be unable to exhibit the concentration, persistence, and pace required in a typical job setting; would be unable to work a normal work day without the necessity of frequent breaks and rest periods; and would likely be absent from work more than four times per month if a job attempt were made.  When asked to state the plaintiff's specific limitations, Dr. Grady indicated that the plaintiff should not stand or walk for extended periods, climb, crawl, balance, kneel, squat, bend, or stoop.  He also indicated that the plaintiff could not lift more

than 15 pounds.  Dr. Grady did not indicate that this opinion was retroactive or that it intended to reflect the plaintiff's limitations as of January 2010 (Tr. 208)

A letter from Westgate Training and Consultation Network dated January 12, 2013, indicated that the plaintiff initiated therapy for emotional problems on February 21, 2012, and attended 30 sessions between February 2012 and January 2013 (Tr. 242).[2] The note indicates that the plaintiff's Global Assessment of Functioning ("GAF") scores ranged from 60-65 (Tr. 239).[3]

### Administrative Hearing

On direct examination by the Administrative Law Judge, the plaintiff testified that his most severe impairment would be his knees, but that he also had problems with his shoulders, back, gout, feet, hypertension, anxiety, and depression. (T. 297-302). When questioned regarding the severity of his pain, the plaintiff indicated that his pain was constant, occurring daily, and stated the intensity was 8 out of 10 (Tr. 301, 307).  The plaintiff stated his pain medication interfered with his ability to concentrate and do simple activities such as read (T. 308).  Prior to his total left knee replacement in January 2012, the plaintiff could only sit for 15 minutes before his pain got worse and he needed to either shift positions or stand up to relieve the pain (Tr. 298-300).  Also prior to surgery, the plaintiff reported that he was only able to walk for 15-20 feet before needing to stop to rest (Tr. 299).  The plaintiff testified that he could only lift 10-15 pounds comfortably (Tr. 308). He had no hobbies and spent an average day trying to deal with his pain.  The plaintiff

---

[2]  The note does not indicate how many of these sessions took place before the end of the relevant period.

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See*  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*").  A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

stated that he needed assistance getting dressed from his wife or his grandson (T. 311). The plaintiff opined that he was not able to participate in any housework or yard work for the two and a half years prior to the hearing (Tr. 312). He did not prepare any meals, including simple meals such as sandwiches, and he relied on others to run errands outside the home, noting that he has not driven since 2010, and did no socializing outside the home (Tr. 305, 312-14). The pain was so severe that the plaintiff could only sleep two hours a night (Tr. 309).

The plaintiff testified that Dr. Grady performed a total left knee replacement the month prior to his hearing (Tr. 297). Dr. Grady further recommended a total replacement of the right knee in July following the hearing (Tr. 298). The plaintiff also stated that he was informed that due to degenerative disc disease in his lumbar spine, he would potentially need back surgery. Prior to his hearing, the plaintiff indicated that he had a history of epidural injections for his lower back (Tr. 300).

With regard to his emotional issues, the plaintiff stated that he was treated for depression and anxiety at West Gate Family Counseling (Tr. 300, 304). The plaintiff had seen a counselor for over 30 sessions prior to the hearing (Tr. 303). The plaintiff testified that he suffers from depression and anxiety (T. 304).

## **ANALYSIS**

The relevant time period before the court is between the plaintiff's alleged disability onset date, January 1, 2010, and August 23, 2012, the day before the date on which the ALJ found the plaintiff's period of disability began. The plaintiff was 47 years old on his alleged disability onset date. He has a high school education and past relevant work as a machine feeder, machine operator, and plant supervisor (Tr. 321).

The plaintiff argues that the ALJ erred by (1) failing to give substantial weight to his subjective complaints; (2) failing to give proper weight to Dr. Grady's opinion; (3) relying on the Medical Vocational Guidelines to determine he was not disabled prior to

12

August 24, 2012; and (4) failing to include any mental limitations in the hypothetical to the vocational expert (pl. brief at 10-15).

### Credibility

The plaintiff argues that the ALJ failed to properly evaluate his credibility (pl. brief at 11-13). The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "'Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most

13

> certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

14

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ considered the plaintiff's subjective complaints in accordance with the above law and found that, while the plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not entirely credible (Tr. 26). Specifically, the ALJ explained that the objective medical evidence prior to August 24, 2012, did not support a finding of work preclusive limitations (Tr. 33-35). Although the plaintiff reported significant shoulder problems, he had normal range of motion in his shoulders, elbows, wrists, and hands, and full 5 out of 5 muscle strength during the relevant period (Tr. 35; *see* Tr. 160). As the ALJ noted, treatment notes from this period do not document significant complaints or objective findings related to a shoulder condition (Tr. 33, 35; *see also* Tr. 24-25, 27-28).  The ALJ further noted that consultative examiner Dr. Rowland

15

observed that the plaintiff did not walk with an assistive device, had normal station, and while he walked with a moderate antalgic gait, he had "absolutely no limp with distraction" (Tr. 31, 35; *see* Tr. 160, 162).  The plaintiff had no joint effusion in his knees, "very slight" tenderness in his left knee "but none with distraction," and no swelling.   He also demonstrated normal spinal alignment with no evidence of spasms or tenderness.   The plaintiff also had positive Waddell's signs (Tr. 31, 35; *see* Tr. 161).  The ALJ also noted that Dr. Rowland concluded that the plaintiff "ha[d] a lot of exaggeration," and his "symptoms far outweigh[ed] objective findings" (Tr. 31-32; *see* Tr. 162).

The ALJ further noted that the plaintiff's first visit to an orthopedist was in July 2012, just one month prior to the established onset date (Tr. 30, 34).  At that time, the plaintiff displayed mild swelling in his left knee, was alert and oriented in no acute distress, displayed minimal tenderness, was neurovascularly intact, and did not have any instability (Tr. 204).  Similarly, on August 17, 2012, one week before the end of the relevant period, the plaintiff displayed normal reflexes, coordination, muscle strength, and tone (Tr. 261). The ALJ further noted that, prior to the established onset date of August 24, 2012, the plaintiff's primary care providers treated his conditions relatively conservatively with medications (Tr. 34).  Both the epidural steroid injection in the low back and the left knee replacement surgery occurred after August 2012 (Tr. 32, 35).  Further, the medical record indicated that the plaintiff did not seek treatment at the emergency room and was not hospitalized for evaluation or treatment of a physical or mental condition prior to the established onset date (Tr. 29, 34).

The ALJ further noted inconsistencies that undermined the plaintiff's credibility, including that the record contained a nearly one-year gap in treatment between March 2011 and February 2012 (Tr. 27-28, 34; *see* Tr. 147).  The ALJ further explained that the plaintiff was not always compliant with medication recommendations, and, despite self-reduction in pain medication, the plaintiff did not seek follow up medication care and

his examinations remained largely unchanged (Tr. 27; *see* Tr. 147-49). With respect to the plaintiff's alleged mental symptoms, the ALJ noted that the plaintiff did not allege disability due to a mental condition (Tr. 32; *see* Tr. 111, 124-25). Further, no problems with understanding or concentration were observed when the plaintiff applied for benefits (Tr. 32; *see* Tr. 108). The ALJ also noted that the plaintiff's GAF scores ranged from 60-65 during his treatment with the Westgate Training and Consultation Network, and the mental health provider did not reference abnormal clinical signs or work related functional limitations (Tr. 22; *see* Tr. 239). The plaintiff denied depression at his consultative examination (Tr. 22; *see* Tr. 159). Moreover, the ALJ noted that the primary care records prior to the established onset date generally described the plaintiff as pleasant, with normal mood and affect, and full orientation, and progress notes do not document any significant mental symptoms or behaviors (Tr. 22; *see* Tr. 147, 149, 204). At his orthopedic visit in July 2012, the plaintiff was alert, oriented, pleasant, and in no acute distress (Tr. 22; *see* Tr. 202-204). At an August 17, 2012, appointment, just one week before the end of the relevant period, the plaintiff denied difficulty with concentration (Tr. 260).

Based upon the foregoing, the undersigned finds that the ALJ followed applicable law and gave reasons supported by substantial evidence for his credibility finding. Accordingly, this allegation of error is without merit.

### *Treating Physician*

The plaintiff next argues that the ALJ erred in failing to give "great weight" to the opinion of Dr. Grady (pl. brief at 14-15). The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering

an opinion. *Id.* §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As more fully set forth above, on December 27, 2012, Dr. Grady completed a physician statement wherein he checked boxes to indicate that the plaintiff could not engage in any type of employment; would be unable to meet the minimum standards of employment, such as productivity, punctuality, and reliability; would be unable to exhibit the concentration, persistence, and pace required in a typical job setting; would be unable to work a normal work day without the necessity of frequent breaks and rest periods; and would likely be absent from work more than four times per month if a job attempt were made. When asked to state the plaintiff's specific limitations, Dr. Grady indicated that the

plaintiff should not stand or walk for extended periods nor climb, crawl, balance, kneel, squat, bend, or stoop. He also indicated that the plaintiff could not lift more than 15 pounds (Tr. 208).

With regard to the specific functional limitations identified by Dr. Grady, the ALJ noted that the RFC finding was actually more restrictive as to the lifting requirement, as Dr. Grady limited the plaintiff to lifting and carrying no more than 15 pounds, and sedentary work involves lifting no more than ten pounds (Tr. 33). *See* 20 C.F.R. §§ 404.1567(a), 416.967(a). With regard to Dr. Grady's limitations as to no extended periods of walking or standing and no climbing, crawling, kneeling, squatting, bending, and stooping, the ALJ noted that these limitations were also consistent with his RFC assessment (Tr. 33; *see* Tr. 208). Otherwise, the ALJ gave the opinion significant weight as of the date of the statement, but little weight as to the period prior to August 24, 2012 (Tr. 33). To the extent the plaintiff suggests that the ALJ should have adopted Dr. Grady's conclusory statements that he could not engage in any type of employment, an ALJ is not required to give "any special significance to the source of the opinion," on the issue of determining a claimant's residual functional capacity or whether he is disabled, as these are issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d). The ALJ noted that Dr. Grady did not begin treating the plaintiff until July 2012,[4] which was only one month prior to the established onset date, and he did not give the opinion until some four months after the established onset date (Tr. 33). Dr. Grady did not indicate that this opinion was retroactive or that it was intended to reflect the plaintiff's limitations as of January 2010. The ALJ further explained that, during the relevant period, progress notes did not support a conclusion that the plaintiff could not perform even sedentary work. The plaintiff received

---

[4]As pointed out by the Commissioner, the record shows that Dr. Grady actually did not begin treating the plaintiff until November 5, 2012, just seven weeks before he gave the opinion at issue here (*see* Tr. 231). The July 2012 orthopedic note the ALJ attributed to Dr. Grady was actually from Dr. Sanchez (*see* Tr. 202-204). As such, there is no evidence that Dr. Grady treated the plaintiff at all during the relevant period.

relatively conservative treatment and did not seek treatment until approximately eleven months after his amended alleged onset date (Tr. 34). Additionally, the ALJ discussed objective findings from Dr. Rowland, including normal station, full muscle strength, normal range of motion in the plaintiff's shoulders, only slightly reduced range of motion in the plaintiff's hip and knee, and evidence of symptom exaggeration (Tr. 35).

Further, the ALJ reasonably noted that treating physicians during the period at issue did not impose any functional restrictions or opine that the plaintiff was unable to work (Tr. 34). The plaintiff contends that it is a "preposterous leap to assume that just because a physician does not impose a functional limitation that a person automatically is not laboring under a disability" (pl. reply at 5 n. 4). Clearly the ALJ did not decide that the plaintiff was "automatically" not disabled because his treating physicians did not impose functional limitations during the relevant period. Rather, in a lengthy and well-reasoned opinion, the ALJ considered the complete record before him, including the absence of such evidence, and to do so was not error. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (stating that the ALJ's evaluation of physician opinions involves consideration of factors such as supportability and consistency with other evidence).

Based upon the foregoing, the undersigned finds that the ALJ articulated valid reasons to support the weight afforded to Dr. Grady's opinion, and substantial evidence supports this assessment.

**Step Five**

At step five of the sequential evaluation process, an ALJ must determine whether a claimant can perform "other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). A claimant can perform "other work" if there are one or more jobs existing in significant numbers in the national economy that he can perform given his functional limitations. *Id.* §§ 404.1566(b), 416.966(b). One of the ways an ALJ can make this determination is through use of the Medical Vocational Guidelines ("the Grids"). 20 C.F.R. pt. 404, subpt.

P, app. 2; *see Heckler v. Campbell*, 461 U.S. 458, 461-62 (1983) ("These guidelines relieve . . . the need to rely on vocational experts by establishing through rulemaking the types and numbers of jobs that exist in the national economy."). The Grids are based upon administrative notice that a significant number of unskilled jobs exist throughout the national economy at the different functional levels. 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(b). The Grids contain numbered tabled rules that direct conclusions of "disabled" or "not disabled" based upon a claimant's vocational factors (age, education, and work experience) in combination with a specific residual functional capacity (sedentary, light, medium, heavy, or very heavy work). *Id.*

Nonexertional limitations will also be considered at step five. *Heckler*, 461 U.S. at 462 n.5; *Wooldridge v. Bowen*, 816 F.2d 157, 161 (4th Cir. 1987); 20 C.F.R. §§ 404.1569a, 416.969a ("When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the demands of jobs other than the strength demands, we consider that you have only nonexertional limitations or restrictions."). In such cases where nonexertional limitations exist, the Grid rules will not be directly applied, but will be used as a framework for evaluating a claimant's ability to perform other work. *See* Social Security Ruling ("SSR") 83-14, 1983 WL 31254, at *3. The applicable Grid rule for a claimant's strength limitations "will be the starting point to evaluate what the person can still do functionally." *Id.* SSR 83-14 explains that the ALJ will evaluate the degree to which the claimant's additional nonexertional limitations erode the occupational base for a given strength level. "After it has been decided that an impaired person can meet the primary strength requirements of sedentary, light, or medium work – sitting, standing, walking, lifting, carrying, pushing, and pulling – a further decision may be required as to how much of this occupational base remains, considering certain nonexertional limitations[,] which the person may also have." *Id.* at *2. SSR 83-14 states that use of a vocational resource may be helpful, and sometimes necessary, in making the

erosion inquiry. *Id.* at \*4. *See, e.g., Golini v. Astrue*, 483 F. App'x 806, 808 (4th Cir. 2012) (reliance on a vocational expert was appropriate where the claimant's limitations placed the claimant "outside the category of individuals contemplated by the Medical-Vocational Guidelines").

As argued by the Commissioner, this is precisely the analysis the ALJ performed in this case (def. brief at 7-9). First, the ALJ found that the plaintiff could perform the strength demands of sedentary work. The ALJ therefore consulted Grid Rule 201.21 as a starting point for his analysis. The ALJ noted that if the plaintiff "had the residual functional capacity to perform the full range of sedentary work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 201.21." However, because the plaintiff's "ability to perform all or substantially all of the requirements of this level of work [sedentary] was impeded by additional limitations[,]" the ALJ did not directly apply Grid Rule 201.21. Instead, "[t]o determine the extent to which these limitations eroded the unskilled sedentary occupational base, [the ALJ] asked the vocational expert whether jobs existed in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity" (Tr. 37). Vocational expert testimony confirmed that the plaintiff's nonexertional limitations did not erode the occupational base and that other work existed that the plaintiff could perform (Tr. 37; *see* Tr. 322).). Because the ALJ relied upon vocational expert testimony and did not use the Grids to direct a finding of not disabled, the plaintiff's allegation of error is without merit.

### Hypothetical

Lastly, the plaintiff argues that the ALJ erred by failing to include any mental limitations in his hypothetical question to the vocational expert (pl. brief at 11). "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Walker v.*

22

*Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (internal citations omitted). *See Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (finding that substantial evidence supported the ALJ's decision that the plaintiff was not disabled where the hypothetical to the vocational expert included all limitations that were supported by the record as a whole). Accordingly, if the record does not support the existence or extent of a limitation, the ALJ need not include it in the hypothetical question. *See Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir.1991) (ALJ not required to include limitations or restrictions in hypothetical that are not supported by the record).

Here, the ALJ reasonably concluded that the record did not support mental health limitations. As the ALJ explained, the record contained a single notation of mental health treatment. Yet, as the ALJ correctly noted, this note does not contain any reference to abnormal clinical findings and does not suggest that the plaintiff had any specific mental functional limitations (Tr. 22; *see* Tr. 239). To the contrary, progress notes prior to August 24, 2012, were essentially devoid of any objective evidence of a significant mental impairment, generally indicating the plaintiff had normal mood and affect and was fully oriented, alert, pleasant, and in no acute distress (Tr. 22). The ALJ also noted that the plaintiff did not allege disability due to a mental impairment in his application and denied any mental symptoms at a consultative examination in July 2011 (Tr. 22; *see* Tr. 111, 159). Although the plaintiff cites his diagnoses of depression and post-traumatic stress syndrome ("PTSD") (pl. brief at 11), a diagnosis alone does not establish functional limitations. "There must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (citation omitted). *See also Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004) ("A diagnosis of impairment, by itself, does not establish entitlement to benefits under the Act. Rather, a claimant must show that the impairment resulted in disabling limitations") (citation omitted). Based upon the foregoing, this allegation of error is without merit as the record does not support mental functional limitations.

23

Furthermore, the ALJ identified only unskilled jobs as those the plaintiff could have performed (Tr. 36-37).  Unskilled work is "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a).  Unskilled work requires the ability to understand, carry out, and remember simple instructions; make judgments that are commensurate with the functions of unskilled work; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting. SSR 96-9p, 1996 WL 374185, at *9.  As argued by the Commissioner, the record does not demonstrate any limitations greater than that of unskilled work.  The plaintiff has not explained or cited any objective evidence to show that he lacked the mental ability to perform even unskilled tasks (*see* pl. brief at 11).  Thus, even if the ALJ had included a specific limitation to simple, routine, repetitive tasks or unskilled work, the outcome of the plaintiff's case would not change, and thus the plaintiff has failed to show harmful error. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 15, 2015
Greenville, South Carolina

24